The next matter on the calendar is Pham v. Kirkpatrick, No. 163542. Good morning, Your Honors. May it please the Court, my name is Malvina Nathanson. I represent Mark Pham. The overriding question in this case is whether or not statements made to a sexual assault forensic examiner are admissible when the person who made the statements is not available for cross-examination. You're on habeas review, though, right? Yes. And so you need to show there was clearly established law that the state erred as to, right? Yes. Sorry to interrupt you. No, no, not at all. The context is important. And I think that the context, I was putting the context in a little different place, but that's, you're quite correct, Judge. That is always the case with habeas corpus. The question is deference to the state court decision. Was the decision contrary to Supreme Court law or was it a misapplication of the law to the facts? And the reason that I stress the fact that these were statements made to the sexual assault forensic examiner is that the state position and the position, I think, of the appellate division is that because that's who the statements were made to, that somehow the Crawford requirements do not apply or do not clearly apply or were not clear under Supreme Court law at the time. Well, I think it's a little bit more nuanced than that. What the state court, I believe, decided was that because the primary purpose of the discussions with the treating physicians in the hospital was treatment, the statements were not, didn't fit the definition of testimonial. So I think your hurdle is to show us that that conclusion violated clearly established constitutional law. Well, I think that that question is more a matter of whether or not the court correctly applied the law to the facts, which raises, well, there is that distinction. I think that the appellate division maybe had two prongs. I think its initial take on this case was Supreme Court has never held that statements to a doctor fall under Crawford. There's some sort of an exception and therefore we don't care. And secondly, they did invoke the primary purpose test and say that the primary purpose was medical treatment. I think for that question, I think it's also important to underline that this was a sexual assault forensic examiner. I don't think it's disputed that in fact the state has in effect enlisted the assistance of medical personnel in investigating and prosecuting sexual assault. They've set up a whole program and they've given the person a name. And I don't think it's disputed that a purpose of the examination was to get information for the investigation and prosecution of the sexual assault. And so the question is, was that the primary purpose? The state court did. The state court found that it was, however, without doing any analysis of any of the facts in the case. But I need to backpedal for a minute. Why isn't it dispositive of the case that the Supreme Court in Ohio versus Clark, which was issued after the state court opinion here, said that it was an open question whether the confrontation clause even applies to statements made to individuals who aren't law enforcement officials. I mean, when we're debating this as an evidentiary question, we can all have different views about the import of these statements and the context and whether it's a primary purpose or dual purpose. But the Supreme Court line of authority came from trying to not give dispositive effect to statements made to law enforcement that weren't susceptible to cross-examination. And the whole prosecution of Sir Walter Raleigh and the history of prosecutions that took place in a civil law kind of inquisitorial system. And we're really far from that here. The Supreme Court was saying at the very time that the state court decided this that it was an open question. Why isn't that enough? The Supreme Court had never before ruled on whether, and that's certainly true, on whether or not the statements made, let's say to a doctor and a social worker in the Clark case, were subject to Crawford. For that matter, when they decided Melendez- Yes. Thank you. They had never before ruled whether or not statements made to or coming through a laboratory were subject. But I think that that's more because the cases hadn't arrived yet. The level- As Judge Parker was saying, you have to show that it was in conflict with clearly established Supreme Court law. And the question, which means what was the Supreme Court law? The Crawford rule was that statements made out of court that were testimonial, without the ability to cross-examine the person who made the statements, are subject to Crawford, are violations of confrontation. And subsequent cases analyzed, evaluated, discussed what testimonial means. But there's nothing about that general principle in Crawford that in any way makes the identity of the speaker or the identity of the questioner of particular importance. And I think that that level of specificity in that decision means that it doesn't matter. It means that the critical question is testimonial, where the statement is testimonial. But there's nothing about the general principles in Crawford, the underlying law, the background, that says that it matters who the speaker is or it matters who the interviewer is. And there's no- One would expect from that decision that the next case that came along with a different speaker or the next case that came along with a different interviewer would also fall under Crawford. The statements might not be testimonial. That's always up for grabs. But I would say that, in fact, it is clear Supreme Court law, regardless of the speaker, regardless of the questioner, if the statements are testimonial, then they don't come in. And it's a matter of what fact pattern is presented the next time the Supreme Court has a case. If, for example, the Supreme Court- Well, it happened. The Supreme Court has a case that involves a social worker. They say, oh, okay, this is new. We've never had a social worker before, but it applies to social workers. And then they were to say, oh, it's a doctor. Well, it applies to doctors. And the next case is a dentist. Oh, it applies to dentists. I don't think that that means that it's new law. I think that it just means that they're applying a clearly established principle to a new set of facts, but not a new set of facts that creates a new legal concept. Thank you very much. I think we have the argument, and you have three minutes for rebuttal. Mr. Rambo. Good morning, Your Honor. Dennis Rambo of the New York State Attorney General's Office, representing the respondent in this proceeding. Your Honor, as you zeroed in, at the time that this case was decided, the Supreme Court had, in fact, never even answered the question and had specifically reserved the question of whether statements made to anyone other than law enforcement officers might implicate the Confrontation Clause at all. In fact, the quote from the footnotes in Davis and Michigan v. Bryant, which was again quoted in Ohio v. Clark subsequent to this decision, was that it expressly reserved the question of whether and when statements to someone other than law enforcement personnel are testimonial. So it was an open question at that time whether there would be any confrontation analysis in this situation. But what should we make of the fact that it was Officer Whitney who suggested that O'Hare should go to the hospital and that it was because of his impetus that she went to have the rape kit done and had this interview? And I guess there was agreement also from the doctor that her statements would be shared with law enforcement. Doesn't that give a kind of law enforcement cast to the interview? Well, first, there's nothing to be made of the fact that Officer Whitney suggested to her that she go to the emergency room, because if you look at the timeline of these events, this isn't a situation where someone went through something medically traumatic, sat back, waited, spoke to the police officer at that point, and then decided to go to the emergency room. This is an absolutely fluid series of events. The sexual assault occurs. The victim reaches out to her immediate family over the phone who immediately arrive. The police are called before her brother, her brother-in-law, gets there. And then the officer arrives while the defendant is still in the house and being held down on the couch by the brother. This isn't a situation where she really had the opportunity to think about what she exactly wanted to do. All she knew was that she was in trouble and she needed help, and she quite reasonably called the police first. She's speaking to the police officer as soon as he arrives at the scene. I think there's really nothing to say about her not at that point running off to the emergency room. She's going to wait and cooperate. I take it there's no connection between her rather tragic subsequent death of a heart attack and the events that we're talking about today. No, there's no connection, nothing in the record. She died, I believe, while she was at work. But there do seem to be some elements, you know, of the safe process that are prosecution-oriented and, you know, are conceived of with a further prosecution in mind. That's absolutely correct. Right? And so isn't this kind of a dual purpose? Why does primary purpose make sense as an inquiry in this context? She is operating with a dual purpose, and one of the cases that was cited in our brief was a recent Sixth Circuit decision in Dorsey where, under facts that were remarkably similar to this, it was actually a rape victim there who also died of unrelated causes prior to trial, and that's the way the Sixth Circuit framed the issue, as the district court, I believe, had done below. To state the hopelessly obvious, it is the death that sort of raises this problem, because she isn't there to testify. In this case, yes. In other cases, there's a lot of state cases where this situation happens. It's not always the death, but various reasons why the death. I thought you said the Sixth Circuit. In the Sixth Circuit case, it was just like this. It was the death of the rape victim. And there, I believe, the way they characterized it is they said, the Supreme Court has never ruled on the applicability of Crawford and its confrontation analysis to statements made with a dual purpose, one for medical treatment and one, perhaps, to aid in prosecution. Here, it's essentially the same thing, but as the Health Division found in this case, they looked and they said, look, there was a primary purpose here. It was to give medical treatment, although, as they acknowledged, the secondary purpose of the overall exam was to collect evidence. Does it matter that that one be primary as opposed to the we don't have to even decide that it's a dual purpose? Does it have to be the primary purpose? Well, given that the Supreme Court had never held that it wasn't even clear whether the confrontation analysis would apply at all. Does it matter to us now whether it was the primary purpose or one of two genuine purposes at this point? I would say no, but of course, we have, as we've argued in the brief, there's plenty of record support here for a finding that it is, was, in fact, the primary purpose. So either way, if you were to analyze it, you would come to the conclusion that the State Court here did not act unreasonably in applying Supreme Court law. I would just think, without any particular knowledge, I'm looking forward to the next case, which there surely will be, that to some extent, if you have the victim of a crime who's been hurt, it's hard for me to imagine, based on no evidence at all, but hard for me to imagine, that they aren't all dual purpose, that if you're a doctor, forensic or otherwise, and somebody's brought in who is the apparent victim of a crime, you're doing it for two purposes. You want them to get better, and you know there may be a crime involved. It's quite possible, although there are certain circumstances, I believe, in Ohio v. Clark, when they had a very young child, it was acknowledged that perhaps the child had no purpose at all when he made the statements. But when you're dealing with an adult, I think we can assume there's a purpose. I'm not suggesting that that's never the case. I'm just saying that sounds, to me, without particular facts, it sounds to me like routinely what happens in an emergency ward when somebody is brought in and a doctor, forensic or not, examines them. The doctor knows that first, I've got to get this person to live rather than die, and second, there's likely to be, it can't be an unusual circumstance. No, Your Honor, it's not. And I think it's worth pointing out that the doctor in this case, like any sexual assault nurse examiner or forensic examiner, doesn't cease being a doctor because they have a secondary purpose through this protocol which is established by the state. As the testimony of the- The difference between a nurse examiner and a forensic examiner? A safe examiner, a sexual assault forensic examiner, is a physician. In many places, and even in the state of New York, when you have a nurse performing that function, that person becomes a sane examiner. A safe examiner implies physician, even though the F phonetically sounds like physician, but it doesn't stand for it. One question for you. Was the report itself actually entered into evidence? We don't have a complete record, and I saw the testimony of the examiner reading from the report, and basically I guess she read the text of the report. The medical report is in the state court record in its entirety. And she did, as Your Honor recognizes, the examiner testified straight from the document. She read, at least when she got to the main narrative of the sexual assault that had been provided by the victim, she read it verbatim from the form that she used as she was asking the questions at the outset. And it's pointed out in the brief, I think it's worth mentioning, that the exam itself has many facets. It has four phases according to the doctor, and the first phase is what's called the history portion. And the history portion happens before anything else happens, and as the doctor testified, and of course your task here under the primary purpose test is to look for, at least the state court's purpose, is to look for what objective persons would have thought in that circumstance, but you can't discount what the doctor here actually testified about her own understanding of her own purpose in doing this, particularly since she trained other examiners at her hospital. She was well-versed in this. She testified that she actually started the program to train people to do this there. But she testified that these questions at the outset of the exam were primarily motivated so that she could provide the medical treatment to the victim first and foremost. Clearly, there are other things that happen later in the exam, which one would be hard-pressed to argue served a medical purpose for this individual, such as collecting swabs that might be used for forensic analysis later. But this early portion, this history portion, unquestionably, is subject to the analysis that it was reasonable to find that she was acting with a medical purpose and that the victim would have understood that as she was answering these questions. As we point out in the brief, she had already spoken to the police officer at the scene who then arrested the defendant. She really had every reason to believe that she was in the hospital, informal environment, speaking to a doctor. Excuse me. So the medical purpose included, she said, the discharge plan, making sure that she had a safe place to go. Exactly. That's the reason for asking about the identity of the assailant, although it would not be unreasonable to find that another reason to ask about the identity of the assailant is given that it's a sexual assault and many of the consequences that can come from that involve STDs, pregnancy. If you know that person, if you know their history, that could completely inform how one goes about treating the medical condition in that instance. She didn't testify to that, but the appellate division here certainly could have found that. If your honors don't have any further questions. Thank you very much. Thank you, Judge. I think that the entire medical record is in the appendix from A173. The medical record is there, but I couldn't tell whether it itself had been admitted into evidence. We have the testimony of her reading from it, of the doctor. Right. I believe it was. It was part of the state court record. It was part of the habeas record. Oh, I see. Okay. The Supreme Court does talk about primary purpose. So dual purpose is not, at least under the Supreme Court, a way of analyzing this. But the Supreme Court also says that purposes can change. And so a situation that starts with a medical purpose but shifts to a forensic purpose doesn't immunize everything that was said thereafter. So I think that that may be a way of looking at it. But they do use the language. The Supreme Court has used the language primary purpose. And we've argued that, in fact, if you're on the assumption that Crawford applies and that you therefore have to test whether these statements are testimonial, you need to analyze all the factors. You need to analyze the context. You need to analyze the intent of the speaker and the intent of the interviewer, according to the Supreme Court. And none of that was done. The appellate division apparently accepted the doctor's conclusory statement, I was doing this for medical purposes. And I think that that's another reason, the fact that the appellate division did not make any of that. Isn't that just firmly grounded in common sense? And someone shows up at the hospital and says, I was beaten up and raped. And the first thing the doctor is going to do is examine, look for, and undertake to treat injuries. And I don't think anything about the doctor's examination, physical examination, is inadmissible. Anything the doctor saw during the examination, obviously that comes in. But the doctor's examination, in most instances, the most important part is the... What happened. Yeah. Is the patient's account, you know, what's ailing you? What happened to you? Where do you hurt? Where were you hit? And the doctor's testimony about that, about how she approached that,  and then what did she say and what did you say next. So we don't really know how that questioning went. But I think we need to keep in mind that it was not the victim's idea to go to the hospital. She called, so far as the records show, she called the police. She didn't call an ambulance. She called the police, or it appears she called the police. That's not even clear from the record. We know she called her sister and her sister's husband. Specialized examiners are, in many times, you know, the experience has told us that women who have had these kinds of experiences are confused, are embarrassed, don't know what to do, and, you know, we should be fortunate we have a community that understands the necessity of getting them to medical attention. And I'm delighted that she received medical attention. I just question whether or not what she said should have been introduced into evidence against my client. That does not prevent her from getting medical attention. So I have a few seconds left, but I'm not sure where I am. I think you're over, but take a minute. Am I over my time? Red light means over, but take a minute and just. Oh, because there's time. There's a time thing. Oh, it's telling me how much is going up. I'm going to leave. Thank you very much. All right. Thank you very much. We'll take the matter under advisement.